James HUNTER, Appellant,

v.

UNITED STATES, Appellee.

No. 86–1683.

District of Columbia Court of Appeals.

Submitted July 1, 1988.
Decided Oct. 14, 1988.

Elaine Mittleman, Falls Church, Va., was on the brief for appellant.

Jay B. Stephens, U.S. Atty., Michael W. Farrell, Elizabeth Trosman, Thomas J. Mot-ley and Roberto Iraola, Asst. U.S. Attys., Washington, D.C., were on the brief for appellee.

Before FERREN, ROGERS and STEADMAN, Associate Judges.

ROGERS, Associate Judge:

Appellant James Hunter appeals from the denial of his presentence motion to withdraw his guilty plea under Super.Ct. Crim.R. 32(e) to voluntary manslaughter while armed. He contends that the trial court abused its discretion since the court failed during the Super.Ct.Crim.R. 11 inquiry to make a proper determination of appellant's competence to plead and there were fair and just reasons to allow withdrawal of his plea. Because the trial court improperly ignored evidence bearing on appellant's competence to enter a guilty plea, we reverse and remand to the trial court for further proceedings.

I.

On June 12, 1986, appellant entered a guilty plea to voluntary manslaughter while armed. D.C.Code §§ 22–2405, –3202 (1981). He appeared two more times before the trial court: on August 8, 1986, when he decided to keep to his guilty plea, and on November 13, 1986, when his motion to withdraw his guilty plea was denied. The facts concerning appellant's three appearances are as follows:

On June 12, 1986, after the government had completed its proffer,[1] the trial judge questioned appellant about the shooting in-

---

1. The government proffered that at a trial it would prove that:

On Sunday, April 6, 1986, Thomasina Brown reported for work at an Amoco gas station accompanied by her boyfriend, Kevin Adams. Upon their arrival, Brown and Adams went to the collection booth where two employees from the evening shift were waiting to be relieved. While Brown and the other employees reconciled accounts, they placed a sign on the window stating that the booth was closed.

Appellant, a man of almost sixty, and a friend approached the booth and requested cigarettes. Brown informed appellant that the booth was closed. Appellant began pulling the drawer outside the booth and when Brown asked him to stop, the two exchanged words. Brown stepped out of the booth carrying "a very old bat" and approached appellant. More words were exchanged, and Brown shook the bat close to appellant's face. Appellant then stepped back, took out a pistol and fired two to four shots in Brown's direction. Two bullets hit Brown, who subsequently died from the wounds.

After Brown was shot, her boyfriend, Adams, picked up the baseball bat and chased appellant. Appellant aimed his gun at Adams and pulled the trigger several times, but there were no bullets remaining in the gun. Adams chased appellant, and when Adams caught him, he beat appellant on the head with the baseball bat, which broke. The injuries appellant sustained required his hospitalization.

cident. Appellant acknowledged that he had been involved in a verbal exchange with the decedent (Brown) and stated that three people, Brown and two men, had approached him, causing him to fear they were going to kill him. The judge examined appellant closely on his claimed fear of injury.[2] When the judge encountered difficulty in communicating with appellant, and concluded that appellant was not at the point at which the court could proceed to take his plea,[3] defense counsel[4] spoke with appellant. Thereafter the judge was able, by leading questions,[5] to extract from appellant the admission that he had shot the decedent out of anger rather than fear for his life or safety. The judge then proceeded to ask appellant whether he understood the consequences of entering a guilty plea and appellant routinely answered yes.

The judge accepted appellant's plea and scheduled a sentencing hearing for August 6, 1986. Two days before the hearing, appellant's counsel informed the judge that appellant might want to withdraw his plea. The judge postponed the sentencing hearing for two days so appellant and his counsel could confer.

At appellant's second appearance before the judge, on August 8, 1986, the judge placed appellant under oath and he stated that he would "keep the guilty plea." The judge noted, however, that appellant had given a different version of the facts to the probation officer than he had given to the court. Ms. Betsy Biden, a program devel-

2. THE COURT: Did you really think that they were going to kill you?
THE DEFENDANT: I think so.
THE COURT: In other words, are you saying that you only shot her because you thought you were going to die?
THE DEFENDANT: No. No, not, I don't know what happened.
THE COURT: Weren't you really, didn't you really shoot her because you were angry at her for shaking that bat in your face? Didn't you get pretty angry about how she was treating you?
THE DEFENDANT: I got angry.
THE COURT: And isn't the reason you shot her because you were angry at her and not because you were really afraid of her? She wasn't very big, was she?
THE DEFENDANT: No, she wasn't very big.
THE COURT: And you really didn't think she was going to hurt you real badly, did you? You thought she might hit you but did you really think she was going to hurt you real badly?
THE DEFENDANT: Oh, I was scared of her and the two, two dudes.
THE COURT: Well, were the two dudes doing anything?
THE DEFENDANT: Yeah, she was coming up they were right behind right with her.
\* \* \* \* \* \*
THE COURT: But didn't she start to back away from you when you pulled the gun out?
THE DEFENDANT: No, she never did start to back away.

3. THE COURT: What I need to understand is whether you shot her because she was shaking that bat in your face and [s]he was treating you real badly and you were angry. Or whether you shot her because you really thought this little five foot two lady with this little baseball bat was really going to seriously hurt you or kill you. I need to know which way it is, whether it was because you thought she was going to seriously hurt you or kill you or if you were just real, real angry because of the way she was treating you.

Do you understand the question, what I'm asking?
THE DEFENDANT: No, Ma'am, I don't.
\* \* \* \* \* \*
THE COURT: All right. So what I need to know is which is the reason for why you shot her? Was it because you were real mad or was it because you thought she was going to hurt you real badly or kill you?
THE DEFENDANT: I shot her because I thought she was going to hurt me real bad and then that's why I was angry.
THE COURT: We're not there.

4. Appellant is represented by different counsel on appeal.

5. The tenor of the trial judge's questioning is clear from the following exchange:
THE COURT: [Y]ou really didn't think she was going to kill you or hurt you real badly, did you?
I mean you didn't like what she was doing but you really didn't think that she was going to kill you, did you?
THE DEFENDANT: No.
THE COURT: She is not very big, right?
THE DEFENDANT: Right.
THE COURT: And you're probably good enough size you could have probably taken that bat away from her, couldn't you? Don't you think? Or at least pull that gun, point it at her and say you better get away from me. You really didn't have to kill her, did you, to save yourself?
THE DEFENDANT: No.
THE COURT: What's wrong, you have a problem the way I'm going about it, Mr. Motley?
[THE PROSECUTOR:] Nothing Your Honor.

oper from the Offender Rehabilitation Division of the D.C. Public Defender Service, who appeared in court with appellant and defense counsel, then informed the judge, at the bench with both counsel present, that she expected a psychological evaluation to be performed on appellant would show "severe organic brain damage" due in part to appellant's alcohol abuse. She further stated that she did not believe appellant remembered "from time to time what he says," and that she doubted appellant understood that the testimony he had given at the first plea hearing differed from the information he gave to the probation officer. The judge commented that "if [appellant] doesn't understand those basic things ... we may have to set aside the plea *sua sponte*. What are you saying? He is not competent to understand the facts?" The judge observed that she had "a feeling" that "there were some problems with his mental capacity [although] [n]ot to the point of his being incompetent or anything. He is, just let's say, slow."

The judge then questioned appellant who stated that he remembered the date on which the shooting occurred, and he gave a series of yes and no answers to the judge's leading questions about whether he acted out of fear or was simply angry. The judge concluded that appellant's responses "wipe[d] out any self-defense," and set a new sentencing date, allowing six weeks for the completion of a psychological evaluation. Sentencing was again continued, from September 24 to November 13, because the psychological evaluation had not been completed.

The day before appellant's third appearance before the judge, for the sentencing, appellant filed, on November 12, 1986, a motion to withdraw his guilty plea under Super.Ct.Crim.R. 32(e). In the motion he

claimed that his plea had not been knowingly and voluntarily made because he had not comprehended the law of self-defense.[6] He further stated that he had tried to assert his claim of self-defense at his first sentencing hearing, on August 6, 1986, and that he had decided to plead guilty only after "apparent equivocation." At the sentencing hearing on November 13, the judge denied appellant's motion.

In denying appellant's motion to withdraw his guilty plea, the judge stated the following reasons. First, the presentence report indicated that appellant had ten prior convictions (including manslaughter[7] and several gun charges and excluding convictions for drunken and disorderly conduct), and, hence, appellant was not a stranger to the criminal justice system and was fully capable of understanding, and, further, did in fact understand, the court's explanation of the sentence he could receive. Second, although appellant had been given the opportunity to withdraw his plea on August 8, he had elected, under oath, to keep his plea; indeed, appellant had "clearly ... admitted" on two occasions that he had not acted in self-defense, and had decided not to assert the defense. The judge noted that she did not know what the psychological evaluation said because she had not received a copy. Third, appellant had told the court under oath that he had committed the offense "in such a way as would be inconsistent with self-defense and, therefore, [appellant's] last-minute assertion of innocence ... is not anything more but a fear on the part of a man who is 59 or 60 about what this court's sentence is going to be in terms of the rest of his life." Fourth, based on the judge's knowledge of defense counsel, the judge was certain counsel had ably represented appellant.[8]

---

6. Appellant also claimed that he had not understood that he was exposing himself to a sentence of fifteen years to life in prison.

7. As became clear later during sentencing, the judge mistakenly thought that appellant had previously been convicted of manslaughter. Although he had been indicted for second degree murder (manslaughter), he had only been convicted of a gun charge.

8. The trial judge also found that appellant had waited until the eve of sentencing to file his motion to withdraw. The judge stated that she "had no inkling from August 6th until yesterday ... that there was any indication that [appellant] was again considering withdrawing his guilty plea." Finally, the judge found that the government's proffer was extremely strong, and that the five-month delay prejudiced the govern-

Appellant then told the judge that he wished to withdraw his guilty plea for several reasons, but that he "couldn't deny that [he] did admit the crime." Appellant said that one reason he wanted to withdraw his plea was because the government said it had several witnesses but no one had picked him out at the lineup and he wanted to see the witnesses in the case. He said that he was going along with the plea because even if he filed a motion to withdraw it, the judge had said she did not have to grant the motion. The judge thereupon told appellant that she did not understand what he was saying, and appellant explained that at his second appearance, when he came for the August 6 hearing, the judge had done all the talking and he had just listened except when he was put under oath and admitted the crime. The judge again said she did not understand, and appellant said "[e]ven if I go to trial, I still wouldn't deny it." Defense counsel then gave the judge the psychological evaluation, commenting that it had not previously been given to the judge because of the possible withdrawal of the plea. The judge passed the case to review the report. When court reconvened, the judge sentenced appellant to twelve to thirty-six years imprisonment for manslaughter while armed.

## II.

In reviewing a decision by a trial court to deny a pre-sentence motion to withdraw a guilty plea under Super.Ct.Crim.R. 32(e), we begin by applying the long established test set forth most recently in *Gooding v. United States,* 529 A.2d 301 (D.C.1987). This court must determine whether the trial court abused its discretion in denying such a motion where the standard that the trial judge must apply is whether granting the request would seem "fair and just." *Gooding, supra,* 529 A.2d at 306. Furthermore, the law is long settled that such

requests are to be "freely granted." *Id.* We also examine the trial court's decision in light of certain factors. *See id.* at 307–11. Looking at those factors, and bearing in mind that no single factor is determinative, we note that, strictly speaking, at least two of the factors support the trial judge's decision. Appellant did not formally move to withdraw his plea until the eve of sentencing, which was five months after he had first pleaded guilty. *United States v. Barker,* 168 U.S.App.D.C. 312, 326, 514 F.2d 208, 222, *cert. denied,* 421 U.S. 1013, 95 S.Ct. 2420, 44 L.Ed.2d 682 (1975). Appellant also had competent counsel at all times, and there is nothing to suggest a breakdown in communication such as occurred in *Gooding, supra,* 529 A.2d at 311.[9] Yet, as to each of these factors, the record shows that appellant stated his ambivalence about his plea within two months of his initial plea and that defense counsel never successfully conveyed to appellant the effect of a self-defense claim on his guilt or innocence of the charged offenses. Another factor, the assertion of innocence, presents an even more problematic situation.

When appellant initially appeared before the trial judge, he advised the judge, as she acknowledged, that he had acted in fear for his life. Thus, appellant asserted his innocence early, and it was not within the province of the plea-taking judge to decide the merits of his self-defense claim. *Gooding, supra,* 529 A.2d at 301 (citing *Gearhart v. United States,* 106 U.S.App.D.C. 270, 273, 272 F.2d 499, 502 (1959)). However, at his first appearance, after defense counsel spoke with appellant, he also affirmatively answered the judge's question that he did not think he was in danger of serious physical harm when he shot the decedent. This answer, the government maintains, should end our inquiry. However, to do so would ignore the fact that before sentencing there was information about appellant

---

ment because it was possible that it would not be able to gather all of its witnesses.

**9.** We note, however, that as in *Gooding,* appellant gave ambiguous and contradictory answers at the time he entered his guilty plea, and this

"implies the possibility of some confusion as to the nature of the [self-defense claim], irrespective of the ability with which [appellant] was advised by counsel." *Gooding, supra,* 529 A.2d at 311.

available to the judge that directly pertained to his ability to understand the Rule 11 plea proceedings. The psychological evaluation explained why the judge had experienced difficulty in communicating with appellant and why appellant may have feared for his life when he was being approached by the decedent. See note 11, *infra.*

In *Willis v. United States,* 468 A.2d 1320 (D.C.1983), the court held that where the issue of a defendant's mental competence had been raised on the record, the trial court must conduct "a specialized hearing to determine the competence of a defendant who seeks to plead guilty...." *Id.* at 1323. The court relied on *Westbrook v. Arizona,* 384 U.S. 150, 151, 86 S.Ct. 1320, 1320, 16 L.Ed.2d 429 (1960) (competence to waive assistance of counsel at trial), *Sieling v. Eyman,* 478 F.2d 211, 215 (9th Cir. 1973) (extending the holding in *Westbrook* to the plea content "to require a higher level of scrutiny in hearings on specific competency issues than in hearings on competence to stand trial"), and *Frendak v. United States,* 408 A.2d 364, 379 (D.C. 1979) (following *Sieling v. Eyman*), to hold that the trial court must make an explicit finding of competence at this stage of the proceedings. 468 A.2d at 1323 & n. 1. Thus, under *Willis,* before the trial court may determine whether the accused *in fact* understands the important procedural safeguards relinquished in pleading guilty, the court has an obligation to satisfy itself that the defendant has the mental capacity to achieve the necessary understanding.[10] *Willis,* which involved a post-

sentence motion to withdraw a plea, is no less applicable to a presentence plea. *Cf. United States v. Masthers,* 176 U.S.App. D.C. 242, 539 F.2d 721 (1976) (presentence plea by mentally retarded defendant). *Cf. also Carmichael v. United States,* 479 A.2d 325, 327 (D.C.1984) (post-sentence motion to withdraw plea).

The government maintains that appellant never requested a competency examination and that when an evaluation was made prior to sentencing, it did not indicate that appellant was incompetent at the time he entered his plea. Both of the cases on which the government relies, *Willis, supra,* 468 A.2d at 1323, and *United States v. Holland,* 170 F.Supp. 83, 84 (D.D.C.1959), involved post-sentence requests to withdrawn guilty pleas and, hence, the more stringent standard of "manifest injustice" applied. Here the more lenient "fair and just" standard applies, and a threshold issue involving appellant's competency to plead was presented by the record before the trial judge. The psychological evaluation, although not addressing the issue of competence to plead as such, included an extended discussion of appellant's personal background and test performance that, at a minimum, was relevant to whether he was able to understand the effect of his self-defense claim on his guilt and the consequence of his plea of guilty.[11] The trial judge was alerted to the issue of appellant's competence to enter a plea during his second appearance, when Ms. Biden informed the judge that appellant appeared to be suffering from organic brain damage. The record also is clear that the trial judge

10. A separate hearing is not required if there is a pre-plea determination of competence based on a psychiatric evaluation and no new factual issues pertaining to competence are raised in the motion to withdraw the plea. *Willis, supra,* 468 A.2d at 1323 (citing *Alfano v. United States,* 326 F.Supp. 792 (D.Conn.1971)).

11. In exploring the extent of his alcoholism, the psychological evaluation noted that appellant had been drinking heavily every day for forty years, that he blacked out daily, his mind "'coming and going' even before the incident at the gas station," and that he had trouble remembering simple facts and had difficulty with simple concepts. He had left school after a third grade education and "his overall level of intel-

lectual functioning[,]" greatly aggravated by his chronic alcoholism, "is at the low end of the Borderline range of ability (IQ 70–79)." All of his criminal offenses had stemmed from periods when appellant had been drinking. The report also stated that appellant had a psychiatric interview in connection with the evaluation but no psychiatric evaluation or diagnosis was stated in the report. The report explained, in terms of appellant's personal background and his difficult relationship as a child with his grandmother, why appellant might have feared the decedent when she approached him with a bat. His personal history also explained why he thought it was necessary to carry a gun.

was personally aware that there might be reason to doubt whether appellant fully appreciated the effect of his self-defense claim on his guilt or innocence based on her acknowledged difficulty in communicating with him at his initial appearance on June 12 and before sentencing on November 13. The judge had purposefully postponed sentencing hearing to permit completion of a psychological evaluation of appellant. Nevertheless, the judge denied appellant's motion to withdraw his guilty plea without first requesting to see the psychological evaluation, and, depending on its contents, conducting a special inquiry into appellant's competence.

The psychological evaluation called into question key parts of the findings on which the trial judge relied in denying appellant's motion to withdraw his plea. Those findings related to appellant's ability to understand the Rule 11 proceedings and to decide not to assert his self-defense claim. The evaluation suggested problems with the judge's reliance on appellant's criminal record as a basis for concluding that he was fully capable of understanding the plea proceedings as well as with her view

of appellant's statements about the nature of his fear of the decedent. Moreover, the judge's reliance on her personal observations of appellant as a basis on which to determine appellant's competency to enter a plea was misplaced. *United States v. Masthers, supra,* 176 U.S.App.D.C. at 249 & nn. 49–50, 539 F.2d at 728 & nn. 49–50 (citing *Pate v. Robinson,* 383 U.S. 375, 386, 86 S.Ct. 836, 842, 15 L.Ed.2d 815 (1966), and various federal court decisions).[12]

Accordingly, we hold that, in determining whether it would be fair and just to allow appellant to withdraw his guilty plea, the trial judge erred in failing to consider available information concerning appellant's competence to enter a plea, and we reverse and remand the case to the trial court so it may consider whether to grant or deny appellant's motion to withdraw his guilty plea.

---

**12.** There are striking similarities between the instant case and *Masthers, supra,* 176 U.S.App. D.C. 242, 539 F.2d 721, where the United States Court of Appeals for the District of Columbia Circuit reversed the denial without a hearing of a motion under 28 U.S.C. § 2255 to vacate a presentence plea on grounds of incompetence to plead. The district court judge had denied relief on the basis of the defendant's failure to raise the issue of incompetence before sentencing, the judge's personal observations of him, and his admission of his role in the robbery. The U.S. Court of Appeals, premising its decision on the firmly established rule that a plea that is not voluntary and knowing has been obtained in violation of due process and is void, reversed the denial of the motion to vacate because a "suitable" hearing was required since the record did not show that the defendant was entitled to no relief. It noted that "[t]here were

indications from the very outset that [the defendant] was mentally deficient." *Id.* at 244, 539 F.2d at 723. For example, the defendant had often answered the trial judge's Rule 11 questions yes or no, and the trial judge had been alerted that the defendant was illiterate, had less than a fifth grade education, and that attention should be placed on the psychological aspect prior to sentencing. *Id.* Sentencing was delayed pending preparation of a presentence report that revealed the defendant's mental deficiencies and extraordinarily low intelligence. *Id.* at 244–45, 539 F.2d at 723–24. Defense counsel acknowledged that she had failed to recognize the defendant's retardation, and that his manner and acquiescence had caused counsel to believe he understood the proceedings and consequences of his plea. *Id.* at 248, 539 F.2d at 725.